SO ORDERED: October 19, 2016.



**Basil H. Lorch III**
**United States Bankruptcy Judge**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF INDIANA
NEW ALBANY DIVISION

| | | |
|---|---|---|
| In re: | ) | |
| SAM'S NA, INC, | ) | Case No. 13-90259-BHL-11 |
| Debtor | ) | |
| ――――――――――――――――――― | ) | |
| | ) | |
| SAM'S NA, INC, | ) | |
| Plaintiff, | ) | |
| v. | ) | Adv. No. 14-59035 |
| | ) | |
| U.S. SMALL BUSINESS | ) | |
| ADMINISTRATION, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| ――――――――――――――――――― | ) | |

<u>**MEMORANDUM IN SUPPORT OF JUDGMENT**</u>

This adversary proceeding was initiated on October 15, 2014, by the filing of a Complaint to adjudicate the rights of multiple parties to certain insurance proceeds due as a result of a fire that occurred at a restaurant operated by the Plaintiff, Sam's NA, Inc. (the "Plaintiff"), on or about December 9, 2013. Plaintiff settled with the U.S. Small Business Association and with Blackstone Capital. The controversy between Plaintiff and the related

defendants Sam's Food and Spirits, LLC, Sam's Indiana, LLC, Main Street Management Associates, LLC, and Douglas K. Gossman (collectively, the "Defendants") continued to trial before this Court on Plaintiff's Second Amended Complaint beginning on May 16, 2016 and concluding on May 19, 2016.  At trial, the parties presented evidence on the issues of breach of contract, breach of warranty, fraud, constructive fraud, conversion, and unjust enrichment. Based upon the evidence presented, the Court now makes the following Findings of Fact:

1. In and about 2000, Sam Anderson ("Anderson") operated a restaurant business (the "Business") at 3800 Payne Koehler Road, in New Albany, Indiana, through an entity called On the Waterfront, Inc. ("OTW") d/b/a Sam's Food & Spirits.

2. In that year, OTW sold the restaurant Business to a newly formed entity named Sam's Food & Spirits, LLC ("SFS"), which was owned and controlled by Main Street Management Associates, LLC ("MSMA") and Doug Gossmann ("Gossmann").

3. Anderson retained ownership of the real property (the "Real Estate") through his entity known as Anderson Rentals, LLC ("Anderson Rentals") which leased the property to SFS.  After the sale, Anderson continued to manage the restaurant as an employee of SFS.

4. In 2008, Anderson needed to liquidate his interest in the Real Estate in order to pay, among other things, obligations attendant to divorce proceedings.  At that time, the parties agreed that Anderson Rentals would sell the real property to a newly formed entity called Sam's Indiana, LLC ("Sam's Indiana"), which was also controlled by Gossmann.

5. In or about February of 2008, Gossmann executed an Equipment Purchase Agreement which effectively transferred all the business equipment from SFS to Sam's Indiana.  There was no evidence that Gossmann's attorney, who prepared the document, or Anderson, was aware of its execution.

2

6. In February of 2008, an appraisal for financing purposes was conducted of all the personal property located on the premises of 3800 Payne Koehler Road.  Anderson was present during the inventory and testified that Gossmann told him the Small Business Association (the "SBA"), a potential lender, would be taking a lien on fixed assets.  Anderson testified that the SBA would not accept used equipment as collateral for the loan and so, by check dated March 14, 2008, SFS issued a check to Anderson for $120,000.00 to make the loan close.[1]

7. The Real Estate transaction was in two parts. The first closing occurred in March 2008 at which Anderson Rentals was paid $1.25 million for the Real Estate through a first and second loan to Sam's Indiana from Stock Yards Bank.

8. In July 2008, Sam's Indiana then refinanced the debt through the SBA, which took a mortgage on the Real Estate and a security interest in equipment and fixtures (the "Business Assets").  There was no evidence that Anderson was present at the closing or was privy to any discussions with the SBA.

9. In the Spring of 2010, Anderson approached Gossmann and Gossmann's business associate, Kevin Wagner ("Wagner"), to buy back the Sam's Food & Spirits restaurant (the "Business").  Attorney John Kraft represented the purchaser and Attorney Richard Mains represented the sellers.

10. During negotiations, the issue was raised as to whether SBA consent was required for the transaction.  It was apparently concluded that consent was required inasmuch as the Asset Purchase Agreement (the "APA") referenced consent and contemplated written consent as an attachment to the APA.

11. Both Attorney Kraft and Attorney Mains testified that while the issue of SBA consent

---

[1] The check was described as a "circular" check in that it simply enabled Anderson to buy a 19% ownership interest in MSMA.

3

arose in negotiations, they were not informed by the sellers or their representatives that the Business Assets were subject to any lien or other encumbrance. Likewise, neither was informed by Defendants that Sam's Indiana, which was not a party to the APA, actually owned the Business Assets. Specifically, Mains participated in the negotiation and revision of the APA in conjunction with Wagner, and was at no time informed that the transaction was anything other than what was stated in the APA.

12. Bill Fensterer ("Fensterer") is the President of Capital Access Corporation ("Capital Access"), an entity through which the SBA administers loans in Kentucky. He testified that he may have had a casual conversation with Gossmann, but that at no time was he asked to obtain SBA consent for the APA sale, nor was he aware of any impending sale of SBA-encumbered assets.

13. The transaction closed on April 21, 2010. Gossmann signed the APA on behalf of the "Selling Party," identified in the APA as MSMA and SFS. He testified that he did not closely review the APA before he signed it. At issue in this case is Section 2.03 of the APA which states in pertinent part as follows:

> "SFS has, as of the date of this Agreement, good and marketable title to all of the Assets, free and clear of all claims, liens, charges, mortgages, security interests or encumbrances whatsoever. . . ."

14. Consideration for the purchase was $776,000.00 which was mainly a debt swap. SFS and Gossmann owed OTW on a note related to the purchase of the Business in 2000 and for unpaid rent to Anderson Rentals between 2000 and 2008, which Anderson forgave. The purchaser (Sam's HP) also agreed to assume certain of the seller's liabilities, which are particularly described in Section 1.02 of the APA. Among the liabilities assumed by Sam's HP was SFS' obligation to Blackstone Capital in the approximate amount of $265,000. Plaintiff Sam's NA, as successor in

interest to Sam's HP, failed to make timely payments on that debt pursuant to the APA, which is evidenced by Blackstone Capital's proof of claim for $468,164.29 in Plaintiff's bankruptcy.

15. In addition, the APA also required the purchaser to enter into a lease agreement with Sam's Indiana for the Real Estate (the "Lease Agreement").  Section 4.07 provides that "simultaneously with the closing on the APA, Purchaser shall enter, and Purchaser and Selling Party shall cause Sam's Indiana, LLC to enter, the lease agreement for the Real Property in the form attached hereto as Schedule 'G.'"

16. Other relevant provisions in the APA pertaining to representations, warranties, and indemnification are the following:

> Section 2.12 warrants against undisclosed liabilities specifically stating that "[t]he Assets are not, or at closing will not be, subject to any liability, commitment, indebtedness or obligation of any kind whatsoever. . . ."

> Section 6.01 provides that "[t]he representations and warranties made by the parties under this Agreement or pursuant hereto shall survive the closing for a period of twelve (12) months.  Except as restricted by the foregoing, the covenants and agreements of the parties hereto, including the indemnification obligations, shall survive the closing."

> Section 6.02 (b) requires Defendants to indemnify Plaintiff for, among other things, "[a] breach of any representation, warranty, covenant or agreement of the Selling Party contained or made pursuant to the Agreement" which specifically includes damages and reasonable attorney's fees and expenses.

17. The uncontroverted testimony at trial proved that neither parties' attorneys were aware of any fact that contradicted the APA or otherwise gave rise to any conclusion that the parties bargained for something other than what was set forth therein.

18. As a further matter, the APA identified the "Purchaser" as Sam's HP, but Sam's HP was not the ultimate purchaser.  Anderson testified that a new entity was the intended operator but it had not yet been fully incorporated.  Anderson formed Plaintiff, Sam's NA, on or about June 18, 2010 to operate the Business using the

5

Business Assets.

19. The rights and assets arising out of the APA were thereafter assigned to Plaintiff, but there was no written assignment from Sam's HP to formalize that arrangement. In his deposition, Anderson testified that written assignment instruments would have been prepared by his accountant, Mark McCormick ("McCormick"), and that the documents would have been destroyed by the December 2013 fire. McCormick testified by affidavit that he was never asked to prepare and never did prepare any written assignment documents for Anderson or any of his entities.

20. Subsequent to the 2010 transaction, Anderson operated the Business through Plaintiff, utilizing the Business Assets and paying rent to Sam's Indiana for the Real Estate pursuant to the Lease Agreement. The Business Assets were recorded and accounted for on the accounting books of Plaintiff from the entity's inception. The Business Assets were never recorded on the books of Sam's HP or any other of Anderson's business entities.

21. In February 2013, Plaintiff filed the instant Chapter 11 proceeding at which time Plaintiff had actual possession and beneficial use of the Business Assets. Shortly thereafter, the Defendants herein obtained bankruptcy counsel who entered her appearance on May 16, 2013.

22. In December 2013, the restaurant experienced a total loss due to fire, after which and through dealings with Plaintiff's insurer, Secura Insurance Company ("Secura"), Plaintiff discovered that the Business Assets were encumbered by the SBA lien. Following the loss of the Business Assets in the fire, Secura insisted that insurance proceeds be paid jointly to Plaintiff and the SBA. While the SBA had been added as a loss payee for business personal property on Plaintiff's insurance policy as of April 2013, Anderson testified that he did not recall requesting or acknowledging this

6

specific policy change, as he had no knowledge of the SBA lien.  As a result of the lien, Plaintiff negotiated a settlement with the SBA of $120,000.00, which allowed Plaintiff to retain $96,000.00 of the insurance proceeds.  The settlement also resulted in an equivalent benefit to Defendants Sam's Indiana and Gossmann by reducing their primary obligation to the SBA.

23. Plaintiff did not thereafter notify Defendants in writing of an indemnification claim for breach of warranty in accordance with the indemnification provision of the APA, and Plaintiff did not otherwise pursue an indemnification remedy through Defendants.

24. As a separate matter, in the course of these proceedings, Anderson learned that Sam's Indiana had been mistakenly receiving and retaining proceeds from Plaintiff's American Express ("AMEX") receipts for over two years from 2013 through 2015.  In that period of time, Sam's Indiana received a total of approximately $93,832.60 from American Express (the "AMEX Funds").  Sam's Indiana retained the Amex Funds with knowledge that they were generated from Plaintiff's business operations and without authorization from the Plaintiff.  Wagner testified that he made unsuccessful attempts to reach Anderson by phone to address the issue, yet Gossman and Wagner admitted that they never actually discussed the misdirected AMEX payments with Anderson or obtained any authorization to retain the AMEX Funds.

25. According to their testimony, Gossman and Wagner assumed that Anderson intended the AMEX Funds to be sent to Sam's Indiana as payment of back rent on the Real Estate.  However, Sam's Indiana did not account for the AMEX Funds as rental income, but rather as a note payable.

26. At the direction of Gossman, portions of the AMEX Funds received by Sam's Indiana were distributed to other entities and to Gossman himself for various purposes,

including repayment of alleged loans to Gossman entities and payment of legal fees.

27. Plaintiff failed to keep current on its rent and property tax obligations under the Lease Agreement with Sam's Indiana for the Real Estate.  Sam's Indiana filed a proof of claim for unpaid rent and property taxes in the amount of $59,772.95 in Plaintiff's bankruptcy.  The parties dispute the actual balance of unpaid rent and property taxes owed by Plaintiff under the Lease Agreement.

### DISCUSSION

Plaintiff's claims against Defendants are for breach of contract, breach of warranty, fraud, and constructive fraud arising out the APA.  Additional claims include conversion and unjust enrichment from the appropriation of Plaintiff's AMEX proceeds.  Adjudication of these claims requires consideration of a number of issues given the untidy transaction between the parties.

At the heart of this controversy lies an APA from which Sam's Indiana, the proper selling party and actual owner of the Business, was omitted.  In addition, the "true" purchasing party in the transaction was not Sam's HP as indicated in the APA.  While Sam's HP was the contracting party, it was never the intended owner or end user of the Business Assets, and all of the rights and assets arising out of the APA were verbally assigned to the true and beneficial owner, Plaintiff Sam's NA, shortly after the transaction closed.

With respect to the APA, Plaintiff asserts that Defendants' omission of Sam's Indiana was intentional and therefore amounted to fraud.  Alternatively, Plaintiff contends that, if the omission of Sam's Indiana is deemed to have been a mistake, the APA should be reformed to reflect Sam's Indiana as the selling party.  Further, Plaintiff asserts that Defendants breached the APA contract and the warranty therein and committed fraud by virtue of the undisclosed SBA lien on the Business Assets.  Defendants, on the other hand, contend that the APA is void *ab initio* because there was never a meeting of the minds between the parties as Defendants

8

believed they were contracting to sell the Business Assets to Sam's HP, when in fact they were selling the Business Assets to an unknown entity in Plaintiff Sam's NA.  If not void, then Defendants reason that the APA should be reformed due to mutual mistake to reflect Sam's Indiana as the selling party.  Defendants assert that Plaintiff cannot recover for breach of contract because Plaintiff is similarly in breach of the terms of the APA, and that Plaintiff failed to establish that breach of warranty was the proximate cause of its loss concerning the $120,000 settlement with the SBA.  Further, Defendants maintain that Plaintiff has no right to a cause of action for actual fraud in light of an invalid assignment of assets and interests from Sam's HP, and that Plaintiff failed to establish constructive fraud in connection with the APA. Notably, Defendants have also contended that, due to the invalid assignment, the court lacks subject matter jurisdiction over this matter because the assets and interests belong to a third party other than the Debtor-Plaintiff.

In addition to the claims related to the APA, Plaintiff contends that Defendants' appropriation of misdirected AMEX Funds amounted to criminal conversion for which Plaintiff is entitled to civil damages.  Finally, Defendants assert in their counterclaim that they are entitled to setoff and recoupment against any award to Plaintiff due to Plaintiff's unpaid rent and property taxes under the Lease Agreement.

### I.    Assignment

Determination of the issues regarding the Court's subject matter jurisdiction and Plaintiff's right to these causes of action is partly informed by the validity of the assignment from Sam's HP to Plaintiff Sam's NA.  As such, the Court turns first to the issue of whether the unwritten assignment of the rights and assets arising out of the APA from Sam's HP to Plaintiff was a valid assignment.  Defendants assert in their Trial Brief that the alleged unwritten assignment of the rights and assets arising out of the APA from Sam's HP to Plaintiff was not supported by evidence and questioned at trial whether any assignment ever took place.

9

"An assignment is a transfer which confers a complete and present right in a subject matter to the assignee." *Brown v. Indiana Nat. Bank*, 476 N.E.2d 888, 894 (Ind. Ct. App. 1985) (quoting *Title Guar. & Sur. Co. of Scranton, Pa. v. State ex rel. Leavenworth State Bank*, 61 Ind. App. 268, 109 N.E. 237, 239 (1915)). As stated by the Supreme Court of Indiana, "[i]n order to constitute an assignment, either in law or equity, there should be an actual or constructive appropriation of the subject-matter assigned as to confer [the] complete and present right on the assignee, even where the circumstances do not admit of its immediate exercise." *Ford v. Garner*, 15 Ind. 298, 301 (1860). Thus, "[i]n determining whether an assignment has been made, the question is one of intent." *Brown*, 476 N.E.2d at 894.

The inquiry here, then, is whether the evidence demonstrates that Anderson and Sam's HP intended to confer a complete and present right in the APA (rights and assets) onto Plaintiff. While Anderson testified in his 2015 deposition that the assignment of rights and assets from Sam's HP to Plaintiff was recorded in written instruments which would have been prepared by his accountant McCormick, no such documents were produced for this litigation. In his deposition, Anderson claimed that the assignment documents would have been destroyed in the fire of December 2013. However, McCormick testified in his Affidavit that he was never asked to prepare and never did prepare any assignment documents for Anderson or any of Anderson's entities, including Sam's HP. Nonetheless, Anderson testified at trial that he and Sam's HP did in fact promptly assign all rights and assets arising out of the APA to the newly formed (as of June 18, 2010) Plaintiff Sam's NA. McCormick also stated in his deposition that the APA Business Assets were recorded and accounted for on the accounting books of Plaintiff from the entity's inception. The assets were never recorded on the books of Sam's HP or any other entity. Furthermore, both Anderson and McCormick testified that Anderson had intended Plaintiff to be the operator of the Business as the transaction was being contemplated, but that Sam's HP was utilized as purchasing party in the APA because Plaintiff had not yet been fully

10

incorporated.

The Court finds the transfer of the APA rights and assets from Sam's HP to Plaintiff was a valid assignment. Despite the fact that the transfer was not formally recorded in writing, the testimony of Anderson and McCormick reflect Anderson's intent to confer a complete and present right in the Business Assets and all other rights[2] under the APA to Plaintiff. The assignment is further evidenced by the accounting books of Plaintiff, on which Plaintiff claimed the Business Assets from the date of the entity's organization. The Court therefore finds that the all of the rights and assets arising out of the APA were effectively assigned from Sam's HP to Plaintiff Sam's NA.

Defendants also contend that the assignment was invalid because the APA contained a consent-to-assignment provision prohibiting assignment without the written consent of Defendants, and Anderson and Sam's HP failed to obtain any such consent from Defendants. The Court understands Plaintiff's position to be that Defendants impliedly waived the consent requirement. Consent-to-assignment provisions are generally enforced. *See Travelers Cas. & Sur. Co. v. United States Filter Corp.*, 895 N.E.2d 1172, 1178 (Ind. 2008). Like other contract provisions, however, a consent-to-assign provision can be waived. "Waiver is an intentional relinquishment of a known right involving both knowledge of the existence of the right and the intention to relinquish it." *Van de Leuv v. Methodist Hosp. of Indiana, Inc.*, 642 N.E.2d 531, 533 (Ind. Ct. App. 1994). Waiver may be implied from the acts, omissions, or conduct of one of the parties to the contract. *Westfield Nat. Ins. Co. v. Nakoa*, 963 N.E.2d 1126, 1132 (Ind. Ct. App. 2012). Mere silence, acquiescence, or inactivity is not sufficient to constitute an express waiver. *Id.* Yet, an implied waiver, or estoppel, may be found where silence and continued acceptance

---

[2] The lack of a writing or recording does not preclude a party from effectively assigning a cause of action in Indiana. Indiana generally allows a tort-based cause of action, such as fraud, to be assigned to another if the action arises out of injury to personal property. *Picadilly, Inc. v. Raikos*, 582 N.E.2d 338, 340 (Ind. 2007) *abrogated by Liggett v. Young*, 877 N.E.2d 178 (Ind. 2007).

11

of defective performance with respect to a condition or promise justifies the belief that such performance is satisfactory, and there is resulting prejudice where the right is later asserted. *See Van de Leuv*, 642 N.E.2d at 533; *Tate v. Secura Ins.*, 587 N.E.2d 665, 671 (Ind. 1992).

In this case, Defendants' conduct in acquiescence to the assignment of the rights and assets arising out of the APA to Plaintiff amounted to an implied waiver of the consent-to-assignment provision and a claim for breach thereof.  Although Defendants maintain that the assignment took place without their knowledge, Defendants did have notice of the assignment and the fact that Anderson was operating the Business using the Business Assets through Plaintiff, as is evidenced by Defendants' acceptance of lease payments to Sam's Indiana from Plaintiff.  Traditionally, a contracting party who accepts payments or other performance of the contract despite knowledge of a condition or breach thereof is considered to have waived the breach.  23 Williston on Contracts § 63:9 (4th ed.); *see McClellan v. Beatty*, 115 Ind. App. 173, 177, 53 N.E.2d 1013, 1015 (1944) (holding that a seller's acceptance of the balance due it under a land contract from the purchaser's assignee "amounted to a recognition of the validity of the assignment and a waiver of its right to prevent one" in spite of a consent-to-assignment provision).  The parties here entered into the transaction understanding that Anderson's LLC would obtain ownership of the Business Assets, assume the swapped business debt, lease the Real Estate from Sam's Indiana, and make the debt and lease payments with revenue generated from the Business.  Defendants' continued acceptance of lease payments from Plaintiff demonstrates consent to Anderson's subsequent assignment of the Business Assets to another of his LLC's.  To allow Defendants to object to the assignment at this stage would unfairly prejudice Plaintiff.  Thus, the Court finds that Defendants' acquiescence implied a waiver of the consent-to-assignment requirement and a claim for breach of that provision.

In light of the determination that the verbal assignment to Plaintiff Sam's NA was a valid assignment after formation of the contract, the Court rejects Defendants' argument that the APA

12

is *void ab initio* due to a lack of mutual assent.  Further, the Court finds that Plaintiff does in fact have a right to the causes of action for fraud, breach of contract, and breach of warranty against Defendants.  Finally, the Court finds that the rights and assets arising out the APA are property of the estate pursuant to § 541(a) as Debtor-Plaintiff Sam's NA was their rightful owner at the time the bankruptcy petition was filed.  Therefore, this Court has subject matter jurisdiction over this proceeding pursuant to 28 U.S.C. §§ 157, and 1334(a) and (b).

## II.    Fraud

Plaintiff asserts that Defendants committed fraud and constructive fraud in connection with the APA by omitting the proper selling party and misrepresenting that the Business Assets were being sold "free and clear" of any liens or encumbrances when in fact the liens were encumbered by the SBA lien.  Defendants maintain that Plaintiff failed to establish these claims. To establish actual fraud, a plaintiff must show (i) a material misrepresentation of past or existing facts by the defendant, which (ii) was false, (iii) was made with knowledge or reckless ignorance of the falseness, (iv) was relied upon by the plaintiff, and (v) proximately caused the plaintiff injury.  *Rice v. Strunk*, 670 N.E.2d 1280, 1289 (Ind. 1996).  To establish constructive fraud, a plaintiff must show (i) a duty owing by the defendant to the plaintiff due to their relationship, (ii) a material misrepresentation in violation of that duty, (iii) reliance thereon by the plaintiff, (iv) injury to the plaintiff as a proximate result thereof, and (v) the gaining of an advantage by the defendant at the expense of the plaintiff.  *Id.* at 1284.  The plaintiff has the burden of proving by a preponderance of the evidence all of the elements of fraud.  *Ohio Farmers Ins. Co. v. Indiana Drywall & Acoustics, Inc.*, 970 N.E.2d 674, 683 (Ind. Ct. App. 2012), *transfer granted, opinion vacated*, 976 N.E.2d 1234 (Ind. 2012), *vacated*, 981 N.E.2d 548 (Ind. 2013), *and opinion reinstated,* 981 N.E.2d 548 (Ind. 2013).

Plaintiff failed to carry its burden of proving actual fraud by a preponderance of the evidence here.  The parties presented conflicting evidence as to intent as well as who had

13

knowledge of what as the parties entered into the transaction. Plaintiff maintains that Gossman and Defendants intentionally omitted Sam's Indiana as the proper selling party and intentionally misrepresented the Business Assets as free and clear of liens in the APA order to avoid the SBA lien issue and preserve the transaction. Defendants, on the other hand, contend that the omission of Sam's Indiana as seller and misrepresentation of the Business Assets as free and clear were mistakes or oversights, and that Anderson knew about the SBA lien given the parties' transactional history and Anderson's role as general manager of the Business. The Court is not convinced that Defendants made fraudulent misrepresentations with knowledge or reckless ignorance of their falseness.

Given the number of similarly named LLC's involved in the Business, the transaction at issue, and prior related transactions, one can see how the SFS operating entity could easily be mistakenly identified as the owner of the Business Assets and selling party in the APA. This conclusion is supported by the fact that neither the attorney for Plaintiff, Richard Mains, nor the attorney for Defendants, John Kraft, was aware of the fact that Sam's Indiana was the actual owner of the Business Assets. Further, Gossman testified that he was not involved in the preparation of the APA and did not thoroughly review the APA before signing the document as he was informed by his attorney that everything was in order. Although Defendants' omission of Sam's Indiana from the APA as the proper selling party may have been negligent from a business and legal standpoint, the Court finds that Plaintiff failed to prove by a preponderance of the evidence that this omission was made with the requisite knowledge of falseness or reckless ignorance of falseness.

Concerning the misrepresentation of the Business Assets as free and clear, the parties' attorneys both testified that they had no knowledge of the SBA lien on the Business Assets. Plaintiff presented evidence that, whereas Anderson had no knowledge of the SBA lien on the Business Assets, Defendants contemplated the issue of SBA consent which Gossman would be

14

responsible for obtaining.   Conversely, Defendants testified that Anderson did in fact know about the lien and that it was Anderson who was responsible for obtaining the consent or otherwise dealing with the SBA.  Further, Defendants testified that the misrepresentation of the Business Assets as free and clear in the APA was a mistake by their attorney.  Given all of the conflicting evidence, and considering the fact that Gossman and Defendants did not thoroughly review the APA, the Court finds that Plaintiff similarly failed to prove by a preponderance of the evidence that this misrepresentation was made with the requisite knowledge of falseness or reckless ignorance of falseness.  However negligent Defendants' conduct may have been, the Court cannot conclude on the basis of the record that it amounted to actual fraud.

Plaintiff also failed to establish constructive fraud.   "Constructive fraud arises by operation of law from a course of conduct, which, if sanctioned by law would secure an unconscionable advantage, irrespective of the actual intent to defraud." *Harmon v. Fisher*, No. 48A02-1511-SC-1957, 2016 WL 3443964, at *4 (Ind. Ct. App. June 23, 2016) (quoting *American Heritage Banco, Inc. v. Cranston*, 928 N.E.2d 239, 246 (Ind. Ct. App. 2010)).  Plaintiff contends that, through the foregoing misrepresentations, Defendants gained an advantage at the expense of Anderson and Plaintiff by inducing Plaintiff to enter into a lease of the Real Estate in conjunction with the execution of the APA.  While it may be true that Anderson and Sam's HP would not have entered into the Lease Agreement but for Defendants' misrepresentations, the Court finds that the advantage gained by Defendants at the expense of Plaintiff does not rise to the level of unconscionable.  Moreover, while the Lease Agreement technically represents a legal agreement separate from the APA, the Lease Agreement was mandated by the APA and was truly a part of a single transaction for the exchange of the Business between the parties.  In that respect, Plaintiff's constructive fraud claim is more appropriately considered a repackaging of its breach of contract and breach of warranty claims.

In Indiana, it is well-settled that a breach of contract claim may not lead to an award of

15

punitive damages. *Sheaff Brock Inv. Advisors, LLC v. Morton*, 7 N.E.3d 278, 288 (Ind. Ct. App. 2014), *transfer denied*, 15 N.E.3d 588 (Ind. 2014). "Rather, only if the claimant proves that the conduct of the breaching party independently establishes the elements of a common law tort for which punitive damages are allowed may the claimant receive punitive damages." *Id*. A claimant who brings both a breach of contract and a fraud claim must therefore prove that (i) the breaching party committed the separate and independent tort of fraud, and (ii) the fraud resulted in injury distinct from that resulting from the breach. *Id*. In failing to establish actual fraud here, Plaintiff failed to establish a distinct injury for which it can recover punitive damages for breach of contract. "While '[b]reaches of contract will almost invariably be regarded by the complaining party as oppressive, if not outright fraudulent,' the claimant must nonetheless prove the independent tort to recover punitive damages." *Id*. (quoting *Tobin v. Ruman*, 819 N.E.2d 78, 86 (Ind. Ct. App. 2004)). Thus, the Court concludes that Plaintiff cannot recover for constructive fraud.

### III.    Reformation of Contract

The Court has thus far determined that the APA is not void in light of an invalid assignment to Plaintiff and that Defendants did not engage in fraud in connection with the APA. With respect to Defendants' omission of Sam's Indiana as the selling party, both Plaintiff and Defendants have proposed in the alternative that the APA should be reformed for mutual mistake to reflect Sam's Indiana as the proper "Selling Party" along with MSMA. Contract reformation is an equitable remedy utilized to relieve parties of mutual mistake or fraud. *Estate of Reasor v. Putnam County*, 635 N.E.2d 153 (Ind.1994). Indiana law provides that "[i]n cases involving mutual mistake, such as this one, the party seeking reformation must establish by clear and convincing evidence 'the true intention of the parties to an instrument, that a mistake was made, that the mistake was mutual, and that the instrument therefore does not reflect the true intentions of the parties.'" *Hudson v. Davis*, 797 N.E.2d 277, 283 (Ind. Ct. App. 2003)

16

(quoting *Estate of Reasor v. Putnam Cnty.*, 635 N.E.2d 153, 158 (Ind.1994)).   The alleged mistake must be one of fact.   *Id.*   While reformation should not be granted where the complaining party simply failed to read the instrument or give heed to its plain terms, "a mistake by the scrivener . . . will permit reformation where it is logically indicated that both parties were mistaken as to the actual contents of the instrument."   *Id.*

In the foregoing discussion of fraud, the Court noted that Plaintiff failed to establish Defendants' omission of Sam's Indiana as intentional or fraudulent.   Rather, the Court, after review of the testimony and evidence presented at trial, finds that the true intention of the parties as shown by clear and convincing evidence was to effectuate a sale of the Business by the rightful owner of the Business Assets, Gossman's Sam's Indiana entity, to Anderson's Sam's HP.   The Court is convinced that both parties did intend to transact for the sale of the Business in good faith.   At some point during preparation, however, Defendants' SFS operating entity was mistakenly identified as the owner of the Business Assets and proper selling party for the APA.   That mistake was reasonable.   After all, SFS did own the Business Assets prior to the 2008 transaction with Anderson for the purchase of the Real Estate.   Moreover, Gossman owns a number of different business interests and restaurant entities, and there are at least six entities between the parties here which contain the word "Sam's" in their names and which have some connection to the Business or related restaurant businesses.

It is understandable that Gossman, Wagner, or another in their shoes could have confused SFS with Sam's Indiana when contemplating the transaction with Anderson or when providing information to the attorneys for the purposes of drafting the APA.   After making such a mistake in the planning phase, one would not be expected to catch the error during a cursory review of a document before execution.   Anderson and attorneys Rich Mains and John Kraft were similarly mistaken as to the actual owner of the Business Assets and proper selling party after relying on the information provided by Defendants.   The Court therefore finds that the

17

intent of the parties was incorrectly reduced to writing in the APA to the extent that it identified SFS as a "Selling Party" along with MSMA.  Thus, the APA shall be reformed to reflect Sam's Indiana and MSMA as the proper "Selling Party" to give effect to the true, common intent of the parties to the transaction.

### IV.    Breach of Warranty and Breach of Contract

Plaintiff asserts a claim for breach of warranty by Defendants due to the fact that the Business Assets were encumbered by the SBA lien.  At the close of trial, the Court granted Plaintiff's oral motion to amend its Complaint to include a claim for breach of contract as well. Although Plaintiff did not elaborate on its argument for the breach of contract claim, the Court understands the contention to be that Defendants breached the APA in failing to indemnify Plaintiff for breach of warranty pursuant the contract's terms.   According to Defendants, Plaintiff's claim for breach of warranty is time-barred by Section 6.01 of the APA, which limits survival of the representations and warranties therein to a period of twelve months from the closing.   Defendants assert that Plaintiff's breach of contract claim must also fail because Plaintiff is similarly in breach of the terms of the APA for failing to pay all consideration due.

The Court notes that breach of warranty and breach of contract are distinct claims that can exist independently.  *Nelson v. Marchand*, 691 N.E.2d 1264, 1271 (Ind. Ct. App. 1998).  As the court in *Nelson* explained: "Although closely related, the two actions are not identical.  A warranty is a promise, usually collateral to the principal contract, although not necessarily so." *Id.* at 1271 n. 8.  "Ordinarily, the term 'warranty' implies an agreement to be responsible for all damages that arise from the falsity of an assurance of fact, or 'a promise that certain facts are truly as they are represented to be and that they will remain so, subject to any specified limitations.'"  *Seibert v. Mock*, 510 N.E.2d 1373, 1376 (Ind. Ct. App. 1987) (internal citations omitted).  Here, the APA was an agreement for the sale of the Business.  The warranty at issue was a collateral promise by Defendants that the Business Assets were free and clear of any

18

liens or encumbrances.

To prevail on a breach of contract claim, a plaintiff must prove (i) a valid and binding contract, (ii) performance by the plaintiff, (iii) non-performance or defective performance by the defendant, and (iv) damages arising from the defendant's breach. *Puller Mortgage Associates, Inc. v. Keegan*, 829 F. Supp. 1507, 1518 (S.D. Ind. 1993) (citing *Strong v. Commercial Carpet Co.*, 163 Ind. App. 145, 152, 322 N.E.2d 387, 391 (1975)); see *also Walker v. Sawyer's Estate*, 34 Ind. App. 239, 70 N.E. 540, 541 (1904)("To entitle appellant to recover, the compliance with the terms of the contract by him should appear from the averments of the complaint.").  As such, Defendants' argument that the Plaintiff cannot recover for breach of contract where it is similarly in breach of the terms of the APA is well-taken.  Pursuant to the APA, Plaintiff assumed SFS' obligations to Blackstone Capital in the amount of $265,000. The assumption of the Blackstone debt was a significant part of the consideration given for the transfer of the Business.  Plaintiff promised to make all payments due under the Blackstone obligations in a timely manner.  The record indicates that Plaintiff failed to do so.  Plaintiff appears to have made minimal payments to Blackstone, which filed a proof of claim for $468,164.29 in Plaintiff's bankruptcy.  Because Plaintiff has not established its own performance under the terms of the APA, it cannot recover for breach of contract by Defendants.

Turning to the breach of warranty claim, the Court will first address the issue of whether the claim is time-barred.  The Indiana statute of limitations in contracts for sale provides:

> "(1) An action for breach of any contract for sale must be commenced within four (4) years after the cause of action has accrued. By the original agreement the parties may reduce the period of limitation to not less than one (1) year, but may not extend it."

Ind. Code Ann. § 26-1-2-725.

Defendants contend that Plaintiff's breach of warranty claim is time-barred by Section 6.01 of the APA which limits the survival period of Defendants' representations and warranties

to a period of twelve months from closing.  If Section 6.01 of the APA expressly provided for a shortened limitations period as allowed by the statute, this might be true.  However, the time for which a warranty survives is distinct from a limitations period.  Survival indicates the time during which a breach of a warranty can give rise to an actionable claim.  A limitations period, on the other hand, governs the time within which a plaintiff may bring that cause of action.  In this case, Section 6.01 of the APA relates to survival – it provides that a breach of Defendants' representations and warranties would only give rise to a cause of action within twelve months of closing.  Because the APA does not expressly set a shorter limitations period elsewhere, the four-year statutory period governs here.

The remaining question, then, is whether a breach of the warranty occurred and a cause of action accrued within the twelve-month survival period.  If so, it gave rise to an actionable claim which Plaintiff then had four years to initiate. Subsection (2) of the statute of states:

> "(2) A cause of action accrues when the breach occurs, regardless of the aggrieved party's lack of knowledge of the breach.  A breach of warranty occurs when tender of delivery is made, except that where a warranty explicitly extends to future performance of the goods and discovery of the breach must await the time of such performance, the cause of action accrues when the breach is or should have been discovered."

*Id.*

Applying the rules of the statute, the breach of Defendants' warranty occurred at the closing of the transaction on April 21, 2010 when the warranty was issued and the encumbered Business Assets were conveyed to Plaintiff.[3]  Thus, Plaintiff's cause of action for breach of warranty accrued well within the twelve-month survival period of Section 6.01 of the APA. Furthermore, the filing of Plaintiff's bankruptcy petition on February 7, 2013 tolled the four-year statute of limitations as of that date pursuant to section 108(a) of the Bankruptcy Code.  This adversary proceeding was initiated on October 15, 2014 within the allotted extension of two

---

[3] The language of Defendants' representations and warranties in the APA states "as of the date of the sale" and does not explicitly extend to the future performance.

years from the order of relief in the bankruptcy case.  Therefore, the Court concludes that the breach of warranty claim is timely.

"Under Indiana law, to prevail on a breach of warranty claim, the plaintiff must show (i) the existence of a warranty; (ii) breach of that warranty; and (iii) that the breach was the proximate cause of the loss sustained."  *Swan Lake Holdings, LLC v. Yamaha Golf Cart Co.*, No. 3:09-CV-228-PPS, 2010 WL 3894576, at *3 (N.D. Ind. Sept. 27, 2010) (citing *Irmscher Suppliers, Inc. v. Schuler*, 909 N.E.2d 1040, 1048 (Ind. Ct. App.2009)).  It is undisputed that Defendants expressly warranted to Plaintiff that the Business Assets were free and clear of liens, thus the SBA lien on the Business Assets was a breach of that warranty.  Defendants do dispute, however, that the breach was a proximate cause of the $120,000 loss sustained by Plaintiff due to the SBA lien.  Defendants point out that there were intervening causes of Plaintiff's loss from the breach of warranty.  Specifically, Plaintiff apparently added the SBA as a loss payee on its insurance policy with Secura as of April 2013, which led to Secura's insistence that insurance proceeds from the lost Business Assets be paid jointly to Plaintiff and the SBA. In addition, Plaintiff chose to voluntarily settle with the SBA and release to it $120,000 of the proceeds rather than pursuing a remedy in court independently or an indemnification claim through Defendants.  According to Defendants, these actions by Plaintiff proximately caused its $120,000 loss.

With regard to proximate causation, the defendant's act at issue need not be the sole proximate cause, as many causes may influence a result.  *Ortho Pharm. Corp. v. Chapman*, 388 N.E.2d 541, 555 (Ind. Ct. App. 1979).  "The question is whether 'the original wrong was one of the proximate rather than *remote* causes.'"  *Id.* (quoting *Dreibelbis v. Bennett*, 319 N.E.2d 634, 638 (Ind. Ct. App. 1974)).  The ultimate test of legal proximate causation is reasonable foreseeability – whether the injury or consequence of the wrongful act is of a class reasonably foreseeable at the time of that act.  *Id.*

Here, Plaintiff's loss of $120,000 of insurance proceeds due to the SBA lien was of a class of consequences reasonably foreseeable at the time the warranty was issued.  It was reasonably foreseeable that the undisclosed SBA lien might cause a loss to Plaintiff if the SBA later attempted to enforce its lien in any manner, whether through litigation, by declining to turnover insurance proceeds, or through other action.  The fact that Plaintiff apparently added the SBA as a loss payee on its insurance policy does not insulate Defendants' from liability for the breach of warranty, as the SBA could have regardless made a claim to the insurance proceeds from the lost Business Assets.  Likewise, Plaintiff's decision to settle with the SBA does not sufficiently break the chain of causation between breach and loss, as Plaintiff would have incurred significant costs along the litigation or indemnification routes.  Plaintiff needed immediate access to the insurance proceeds in order to continue operating the Business, and thus Plaintiff's choice to settle with the SBA actually minimized the consequential cost of the breach.  Although Plaintiff's loss therefrom eventually took shape in the form of a $120,000 settlement with the SBA, it was the breach of warranty itself that actually and most proximately caused the loss sustained by Plaintiff in connection with the SBA lien, not Plaintiff's actions upon learning of the breach.

As such, the Court finds that Plaintiff successfully established its breach of warranty claim.  "The measure of damages for breach of warranty is the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted, unless special circumstances show proximate damages of a different amount." Ind. Code § 26–1–2–714.  Accordingly, the Court finds that Plaintiff is entitled to damages in the amount of $120,000 for breach of warranty, for which Sam's Indiana and MSMA, as the reformed "Selling Party" to the APA, are jointly and severally liable.  Plaintiff asserts that it is also entitled to recover attorney's fees for its breach of warranty claim pursuant to the indemnity provision in Section 6.02 of the APA.  However, the Court declines to award

22

attorney's fees on this claim as Plaintiff failed to comply with the notice requirement of Section 6.02 or otherwise pursue a remedy with Defendants under the indemnity provision prior to this adversary proceeding.

### V.    Conversion

Plaintiff contends that Sam's Indiana's appropriation of $93,832.60 of misdirected AMEX proceeds amounted to criminal conversion for which Sam's Indiana and Gossman are jointly and severally liable.  Defendants counter that Plaintiff failed to establish the requisite *mens rea* element for such a finding.  Pursuant to the Indiana Crime Victim's Relief Act, a victim of criminal conversion may bring a civil action to recover damages from the wrongdoer.  Ind. Code § 34-24-3-1; Ind. Code § 35-43-4-3.  "A criminal conviction for conversion is not a condition precedent to recovery in a civil action brought under the Indiana [C]rime [V]ictim's [R]elief [A]ct," but all elements of the alleged criminal act must be proven by a preponderance of the evidence by the claimant.  *Gilliana v. Paniaguas*, 708 N.E.2d 895, 899 (Ind. Ct. App. 1999).  In Indiana, "a person who knowingly or intentionally exerts unauthorized control over property of another person commits criminal conversion."  Ind. Code § 35-43-4-3.  Thus, the claimant must show that the accused "was [at least] aware of a high probability that this control was unauthorized." *Manzon v. Stant Corp.*, 138 F. Supp. 2d 1110, 1115 (S.D. Ind. 2001).

In this case, it is uncontroverted that Sam's Indiana exerted unauthorized control over approximately $90,000 in payments from AMEX which were generated from Plaintiff's business operations and were property of Plaintiff.  The parties dispute whether Defendants' retention of those funds without authorization was carried out intentionally or knowingly.  Both Gossman and Wagner testified that they assumed that Anderson intended the AMEX Funds to be sent to Sam's Indiana as payment of back rent on the Lease Agreement.  Although Wagner may have made some effort to contact Anderson by phone to clarify the AMEX issue early on after Sam's Indiana first began receiving the funds, both Wagner and Gossman testified that they never

23

actually discussed the AMEX Funds with Anderson or obtained any authorization to retain them.

Further, Defendants retained the AMEX Funds throughout a period of time during which Plaintiff retained bankruptcy counsel, Plaintiff filed for bankruptcy protection, and a fire destroyed Plaintiff's Business and the leased Real Estate for which Defendants maintain that they were retaining the funds.  In light of the Defendant's knowledge of the fire and Plaintiff's financial distress, Defendants' assumption that Plaintiff continued to direct the AMEX funds to Defendants to pay back rent seems less reasonable.  Defendant's position is further weakened by the fact that they did not account for the AMEX Funds as rental income or provide any credit therefor in their proof of claim for rent in Plaintiff's bankruptcy.  After considering the foregoing, the Court concludes that Sam's Indiana retained the AMEX Funds despite awareness of a high probability that it was not authorized to do so.  The Court thus finds that Sam's Indiana did commit criminal conversion by retaining approximately $90,000 of AMEX payments belonging to Plaintiff.  In addition, Gossman personally exerted unauthorized control over Plaintiff's property as Gossman distributed portions of the AMEX Funds to himself.  Applying the foregoing reasoning, the Court finds that Gossman also retained Plaintiff's AMEX Funds despite awareness of a high probability that he was not authorized to do so.  Therefore, the Court finds that Gossman is jointly and severally liable to Plaintiff for conversion along with Sam's Indiana.

Plaintiff asserts that it is entitled to treble damages and attorney's fees for this conversion under the Indiana Crime Victim's Relief Act.  "Although the Relief Act provides that crime victims may recover three times the amount of their actual damages (treble damages), the costs of the action, and reasonable attorney's fees, the amount of any award is ultimately left to the discretion of the trial court."  *Kishpaugh v. Odegard*, 17 N.E.3d 363, 370 (Ind. Ct. App. 2014).  As this Court has noted, treble damages are not mandatory; they are merely the upper limit of a trial court's authority under the statute.  *In re Baker*, No. 10-90127-BHL-7, 2011 WL 4549172, at *7 (Bankr. S.D. Ind. Sept. 28, 2011).  A court may decline to impose exemplary

24

damages altogether.  *Id.*

The Court finds that exemplary damages are not warranted here.  It is unclear how or why the AMEX Funds were directed to Sam's Indiana rather than Plaintiff, but there is no evidence that Defendants engaged in any conduct, fraudulent or otherwise, to induce the mix up.  Furthermore, evidence suggests that Defendants made some attempt to communicate the issue to Anderson by phone, but Anderson did not return their calls.  Defendants' failure to thereafter confirm whether Anderson intended to direct the AMEX Funds to Sam's Indiana was more a product of willful ignorance than nefarious deception.  In this case, Defendants are not able to avoid civil liability for conversion by remaining willfully ignorant.  However, the Court finds that Defendants' conduct was not so heinous or egregious as to warrant an award of exemplary damages beyond the value of the converted property.

The Court therefore finds that Sam's Indiana and Gossman's liability to Plaintiff for civil damages for conversion is limited to the total amount of the misappropriated AMEX Funds.  Defendants dispute Plaintiff's asserted figure of $93,832.60, which was derived from American Express payment records from 2013 through 2015.  Instead, Defendants maintain that they only received approximately $86,000 of Plaintiff's AMEX payments, as is reflected in their business records from the same period.  The Court finds the American Express records to be more credible and concludes that Plaintiff has established by a preponderance of the evidence the total amount of misappropriated AMEX Funds to be $93,832.60.  Accordingly, Sam's Indiana and Gossman are jointly and severally liable to Plaintiff for civil damages for conversion in the amount of $93,832.60.

The Indiana crime victim's relief act does not leave the recovery of attorney's fees to the discretion of the court.  *Burgett v. Haynes*, 572 N.E.2d 1296, 1298 (Ind. Ct. App. 1991); Ind. Code § 34-24-3-1.  On the contrary, "the trial court must award a reasonable fee as part of the plaintiff's recovery" where the plaintiff proves that it has incurred an attorney's fee. *Id.*  As such,

25

the Court finds that Plaintiff is entitled to recover attorney's fees which it proves were incurred in discovering and litigating the foregoing conversion claim in this adversary proceeding.  Plaintiff may, within thirty days after the date of this order, submit an affidavit detailing its attorney's fees and costs for the Court's consideration in determining the appropriate fee award.  The Court, having determined that Plaintiff may recover on its conversion claim, declines to rule on Plaintiff's claim for unjust enrichment concerning the same misappropriation of funds.

### VI.    Defendants' Right to Setoff and Recoupment

Defendants assert that they are entitled to setoff and recoupment for unpaid rent and property taxes under the Lease Agreement against any award to Plaintiff in this adversary proceeding.  Section 553 of the Bankruptcy Code preserves for creditors the common law right of setoff, which "allows entities that owe each other money to apply their mutual debts against each other, thereby avoiding the 'absurdity of making A pay B when B owes A.'"  *In re United Air Lines, Inc.*, 438 F.3d 720, 730 (7th Cir. 2006) (quoting *Citizens Bank of Md. v. Strumpf*, 516 U.S. 16, 18, 116 S.Ct. 286, 133 L.Ed.2d 258 (1995)).  However, a creditor's right to setoff is subject to the automatic stay.  11 U.S.C. § 362(a)(7).  Thus, in the bankruptcy context, both the debtor's claim and the creditor's claim to be setoff must have arisen pre-petition.  *In re Semcrude, L.P.,* 399 B.R. 388, 393 (Bankr. D. Del. 2009).

Although not addressed in the Bankruptcy Code, the doctrine of recoupment is similarly available to creditors in bankruptcy.  *Reiter v. Cooper*, 507 U.S. 258, 113 S.Ct. 1213, 1218, n. 2, 122 L.Ed.2d 604 (1993).  Recoupment differs from setoff in several respects.  Recoupment also allows entities to apply their mutual debts against each other, but, unlike setoff, the doctrine of recoupment requires that the mutual debts arise out of a single transaction.  *Warsco v. Household Bank F.S.B.*, 272 B.R. 246, 253 (Bankr. N.D. Ind. 2002), *subsequently aff'd sub nom. Kleven v. Household Bank F.S.B.*, 334 F.3d 638 (7th Cir. 2003).  In addition, a creditor's right to recoupment is not subject to the automatic stay.  *Id.*  Thus, a creditor can recoup money

26

owed regardless of when the mutual debts arose, so long as they arose out of the same transaction.

In this case, Sam's Indiana has a potential claim for setoff which arose pre-petition. Plaintiff's breach of warranty claim for which Defendants are liable arose pre-petition, as did a significant portion of Plaintiff's obligation to Sam's Indiana for rent and property taxes under the Lease Agreement.  However, the amount which could thereby be setoff is also encompassed within Defendants' claim for recoupment for the entire balance of unpaid rent and property taxes.  "Where mutual debts 'arise out of a single integrated transaction so that it would be inequitable for the debtor to enjoy the benefits of that transaction without also meeting its obligations,' the creditor's apparent offset is really recoupment."  *Id.* (citations omitted).  As such, further discussion of setoff here is unnecessary if Defendants are entitled to recoupment of the entire balance of the unpaid rent and property taxes.

Whether Defendants are entitled to recoupment of all unpaid rent and property taxes under the Real Estate lease against the their liability for breach of warranty turns on whether the APA and Lease Agreement were part of a single transaction.[4]  Two approaches to determining whether two events are part of the same transaction have emerged from case law: the "logical relationship test" and the "single integrated transaction test."  *See   Conopco, Inc. v. Minster Bank*, No. 1:07-CV-1572-DFH-JMS, 2008 WL 4443117, at *10 (S.D. Ind. Sept. 26, 2008).

Under the former approach, the "crucial factor in determining whether two events are part of the same transaction is the 'logical relationship' between the two."  *In re TLC Hospitals,*

---

[4] Some courts, including several within the Seventh Circuit, have permitted recoupment only where there has been some type of express overpayment by a creditor.  *See In re Saint Catherine Hosp. of Indiana*, LLC, 511 B.R. 117, 127 (S.D. Ind. 2014), *rev'd sub nom. Saint Catherine Hosp. of Indiana, LLC v. Indiana Family & Soc. Servs. Admin.*, 800 F.3d 312 (7th Cir. 2015); *In re CDM Mgmt. Servs., Inc.*, 226 B.R. 195, 197 (Bankr. S.D. Ind. 1997); *In re Bertram*, No. 95-510, 1996 WL 33683568, at *2 (Bankr. S.D. Ind. Sept. 22, 1996).  However, the majority of courts impose no such requirement, and this Court is not aware of any authority which binds It to do so here.  Given the equitable nature of recoupment, this Court declines to impose a narrowing overpayment restriction.  Thus, Defendants' right to recoupment hinges on the "single transaction" issue.

*Inc.*, 224 F.3d 1008, 1012 (9th Cir.2000).  The "logical relationship test" accounts for the understanding that "'transaction' is a word of flexible meaning. It may comprehend a series of many occurrences, depending not so much upon the immediateness of their connection as upon their logical relationship." *Conopco, Inc.*, 2008 WL 4443117, at *10 (quoting *Moore v. New York Cotton Exchange*, 270 U.S. 593, 610 (1926)).    "Under this standard, 'courts have permitted a variety of obligations to be recouped against each other, requiring only that the obligations be sufficiently interconnected so that it would be unjust to insist that one party fulfill its obligation without requiring the same of the other party.'" *Id.* (quoting 5 Collier on Bankruptcy ¶ 553.10 (15th ed. rev. 2006)).  In determining whether a logical relationship between the two obligations exists, the focus is on the agreement between the parties.  *In re Health Mgmt. Ltd. P'ship*, 336 B.R. 392, 396 (Bankr. C.D. Ill. 2005).  The First, Ninth, and D.C. Courts of Appeal apply the "logical relationship test," along with a majority of district and bankruptcy courts.  *In re Holyoke Nursing Home, Inc.*, 372 F.3d 1, 4 (1st Cir. 2004); *In re TLC Hospitals, Inc.*, 224 F.3d 1008, 1013–14 (9th Cir.2000); *U.S. v. Consumer Health Services of America, Inc.*, 108 F.3d 390, 395 (D.C.Cir.1997); *see also Health Mgmt. Ltd. P'ship*, 336 B.R. at 396.

Under the more restrictive "single integrated transaction test," "a mere logical relationship is not enough."    *University Medical Center v. Sullivan*, 973 F.2d 1065, 1081 (3d Cir.1992).  Rather, this narrow standard requires that both of the obligations "arise out of a *single integrated transaction* so that it would be inequitable for the debtor to enjoy the benefits of that transaction without also meeting its obligations."    *Id.* (emphasis added).  In application, some courts have concluded that a "single integrated transaction" may only be found where the obligations are so intertwined that the amount of one cannot be determined without resolving the latter.  *See In re Prochnow*, 467 B.R. 656, 667 (C.D. Ill. 2012); *In re St. Francis Physician Network, Inc.*, 213 B.R. 710, 719 (Bankr. N.D. Ill. 1997).  "Under this test, as long as the amount of the relevant obligations sought to be recouped may be 'independently determinable,'

28

recoupment may be denied." *Conopco, Inc.*, 2008 WL 4443117, at *10 (citing *University Medical Center*, 973 F.2d at 1081).

The Seventh Circuit has not expressly adopted a test for the "same transaction" requirement in the recoupment context. *See Conopco, Inc.*, 2008 WL 4443117, at *1 (noting that the Seventh Circuit's passing comment in *Kleven v. Household Bank F.S.B.*, 334 F.3d 638 (7th Cir. 2003) that the refund application loan process at issue was "more accurately viewed as a single integrated transaction" was not an adoption of the "single integrated transaction" test). As noted by the district court in *Conopco*, strict application of the "single integrated transaction" test may be used to deny recoupment in virtually every case, because, to some extent, corresponding obligations are always "independently determinable." *Conopco, Inc.*, 2008 WL 4443117, at *10 (citing 5 Collier on Bankruptcy ¶ 553.10 (15th ed. rev. 2006)).  This Court joins the majority in rejecting the Third Circuit's more restrictive approach in favor of the "logical relationship" test, which more appropriately accommodates the equitable nature of recoupment.

In this case, the APA and the Lease Agreement were sufficiently interconnected such that the two agreements were a part of the same transaction under the "logical relationship" test. In determining whether a logical relationship exists, the focus is on the agreement between the parties.  *In re Health Mgmt. Ltd. P'ship*, 336 B.R. at 396.  The text of Section 4.07 of the APA provides that "simultaneously with the closing on the APA, Purchaser shall enter, and Purchaser and Selling Party shall cause Sam's Indiana, LLC to enter, the lease agreement for the Real Property in the form attached hereto as Schedule 'G.'"  Essentially, entry into the Lease Agreement was a material term of the APA, and part of the consideration exchanged in the deal between Plaintiff and Defendants.  It would be unjust to insist that Defendants now fulfill their warranty obligations without requiring Plaintiff to fulfill its lease obligations.  The Court therefore concludes that Plaintiff's unpaid rent and property taxes under the Lease Agreement and Defendants' liability for breach of warranty under the APA are two debts which arose from the

29

same transaction for the sale of the Business.

Accordingly, the Court finds that Sam's Indiana is entitled to recoupment of the entire balance of the unpaid rent and property taxes under the Lease Agreement against the $120,000 award to Plaintiff for breach of warranty in this action. The Court understands that the actual balance of unpaid rent and property taxes owed by Plaintiff is an amount in dispute. The parties may request an evidentiary hearing to determine the amount owed, and hence, the amount which Defendants are entitled to recoup, if the parties are unable to come to an agreement with respect to the same. To the extent that the debt exceeds the $120,000 award to Plaintiff, Defendants would be entitled to assert a claim for the balance in Plaintiff's bankruptcy case.

### CONCLUSION

Based upon the foregoing, the Court finds that the verbal assignment of the rights and assets arising out of the APA from Sam's HP to Plaintiff Sam's NA was a valid and effective assignment. The APA shall be reformed for mutual mistake to reflect Sam's Indiana and MSMA as the proper "Selling Party" to give effect to the true, common intent of the parties to the transaction. Further, the Court finds that Sam's Indiana and MSMA are jointly and severally liable to Plaintiff for $120,000 in damages for breach of warranty with respect to the undisclosed SBA lien on the Business Assets. In addition, Sam's Indiana and Gossman are jointly and severally liable to Plaintiff for $93,832.60 in civil damages plus attorney's fees for conversion of Plaintiff's American Express proceeds from the Business. Finally, Defendants are entitled to recoupment of all unpaid rent and property taxes owed by Plaintiff under the Lease Agreement against the $120,000 award to Plaintiff for breach of warranty under the APA. The parties may request an evidentiary hearing on the balance of unpaid rent and property taxes for the purposes of Defendants' right to recoupment. The Court shall enter Judgment accordingly.

###

30